**Opinion filed March 14, 2024**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-22-00188-CR, 11-22-00189-CR, 11-22-00190-CR, & 11-22-00191-CR
_____

## ANDREW WILLIAM COX, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause Nos. 25520, 25521, 25522, & 25524**

## M E M O R A N D U M   O P I N I O N

Appellant, Andrew Cox, was indicted in four separate cause numbers for (1) continuous sexual abuse of a child and indecency with a child by contact against Jane Doe and (2) sexual assault of a child and indecency with a child by contact against Jane Doe II.[1]  *See* TEX. PENAL CODE ANN. §§ 21.02, 21.11, 22.011 (West

---

[1]The second-degree felony offenses, the sexual-assault-of-a-child offense and the indecency-with-a-child offenses, were enhanced to a first-degree felony punishment range because of a prior, final felony conviction. *See id.* § 12.42(b) (West 2019).

Supp. 2023). The offenses were consolidated for trial. The jury found Appellant guilty of all four offenses and assessed his punishment at imprisonment in the Correctional Institutions Division of the Texas Department of Criminal Justice for twenty-five years for each of the indecency-by-contact offenses, fifty years for the sexual-assault-of-a-child offense, and fifty years for the continuous-sexual-abuse-of-a-child offense. The trial court sentenced Appellant in accordance with the jury's verdicts and ordered that the sentences be served concurrently.

Appellant raises three issues on appeal. First, he argues that the trial court abused its discretion by admitting an audio recording of a conversation between the victims, their mother, and their mother's niece over his hearsay objection. Second, he argues that the trial court abused its discretion in permitting a witness to testify regarding the "statistical frequency of under reporting [sic] of sexual assault." Third, Appellant argues that the trial court erred by including the prior version of the parole instruction in Article 37.07, Section 4(a), which contained language on "good conduct" time, in its punishment charges. We affirm the judgments of the trial court.

*Factual and Procedural History*

Appellant abused Jane Doe and Jane Doe II[2] (the victims) over a period of approximately three years.

A. *The Sexual Abuse*

Appellant and B.H., the victims' mother, started seeing each other in 2012. They moved to Ranger together around 2013 and married a few years later. B.H. had four children: two daughters, Jane Doe and Jane Doe II, and two younger sons.

---

[2]Pseudonyms are used for the children, their mother, and an outcry witness throughout the opinion to protect their identities.

Jane Doe II testified about the first time Appellant touched her inappropriately.[3] Appellant came into Jane Doe II's bedroom while she was sleeping, placed his hand above her clothes on her stomach, then he moved his hand under her shirt and up to her chest. Jane Doe II tried moving away to see if Appellant would leave her alone, but he continued touching her until she told him to stop. After the first incident, Jane Doe II promptly went to B.H.'s bedroom and told her what happened. Jane Doe II also testified that B.H. told Appellant that "he can't do that" and that "he [could not] be in [Jane Doe II's] [bed]room while [she] was sleeping."[4] One or two months later, Appellant resumed entering her bedroom and touching Jane Doe II, and he would raise her shirt and take pictures of her. Jane Doe II stopped telling B.H. about the incidents after the third encounter, believing Appellant's actions had been "swept under the rug."

In 2017, when B.H. started a job that required her to leave the house before Appellant and Jane Doe II had moved into a bedroom by herself, Appellant's behavior escalated. When Appellant went into Jane Doe II's bedroom, he would shake her "to see if [she] was awake or asleep[,]" put his hand under her shirt, and take off her clothes. Appellant's behavior became more frequent as well: he began to go into her bedroom to touch her once or twice a week, which progressed until he did so every morning and night. Jane Doe II tried and failed to keep Appellant out of her bedroom by locking the door—a lock that Appellant removed—and by moving furniture in front of the door to try to barricade it; neither stopped Appellant.

---

[3]Jane Doe II was eighteen years old at the time of trial and "eleven or twelve" years old when Appellant first touched her inappropriately.

[4]B.H. testified that Jane Doe II initially told her that "[Appellant] just put his hand on her stomach."

After a few months, Appellant's behavior again escalated. Appellant would perform oral sex on Jane Doe II and would restrain her while inserting his fingers into her vagina. Jane Doe II testified that, on one occasion, Appellant positioned himself on top of Jane Doe II and attempted to have sex with her. She yelled at Appellant, forced him off of her, and cowered in the corner on her mattress; Appellant then put his clothes back on and "ran out the door" of the bedroom.

Jane Doe,[5] Jane Doe II's younger sister, testified that Appellant also began to abuse her in 2017 by entering her bedroom, waking her up, and touching her stomach and chest in the same manner described by Jane Doe II. From 2017 until May 2019, Appellant would touch Jane Doe's breasts and/or her genital area on a daily basis. By May 2019, Appellant's behavior had escalated, and he penetrated Jane Doe's genitals with his finger almost every day.

Appellant also engaged in other inappropriate behavior. Jane Doe II would wake up with the lights on, her shirt pulled up, and Appellant taking pictures of her. When Appellant confronted Jane Doe II about her watching pornography, he told her that it was "okay because [he] watch[ed] the same thing," but that, if she would "keep [his] secrets," then he would keep hers. Appellant monitored the house through a comprehensive system of cameras—some known, some hidden. Initially, he installed the cameras when Jane Doe and Jane Doe II were on vacation. Appellant had a phone app that allowed him to view a live feed from the cameras; B.H. initially did not have the app on her phone. Appellant also installed secret cameras in the victims' bedrooms that were hidden inside light fixtures that he had made.

---

[5]Jane Doe was eleven at the time the abuse began (she was sixteen years old at time of trial).

B. *Outcries and Subsequent Audio Recording*

On the evening of May 3, 2019, B.H. took Jane Doe and Jane Doe II to visit her niece, K.L., and help with K.L.'s infant son. When K.L. and Jane Doe II were alone, K.L. asked Jane Doe II if Appellant had ever done anything inappropriate to her, and Jane Doe II "instinctively started crying." K.L. testified that "[i]t was almost as if she was waiting on somebody to ask that question." Jane Doe II told K.L. about Appellant's sexual abuse. The two of them went into the nursery and Jane Doe II recounted Appellant's actions directly to B.H. Having overheard this conversation from another room, Jane Doe came into the nursery and told them about Appellant sexually abusing her also. B.H. returned home alone, questioned Appellant, and asked to see his laptop, phone, and Instagram account. B.H. testified that Appellant said she was "wasting [her] time" and wouldn't find anything, and he denied "intentionally do[ing] anything inappropriate."[6] B.H. then drove back to K.L.'s house and, calling them out to her car, asked Jane Doe and Jane Doe II further questions about Appellant's actions while recording the conversation. Appellant was subsequently arrested, indicted, and convicted of the offenses he committed against Jane Doe and Jane Doe II.

*The Trial Court's Admission of the Audio Recording*

In Appellant's first issue, he argues that the trial court abused its discretion when it admitted, over his hearsay objection, the audio recording of the conversation between Jane Doe, Jane Doe II, K.L., and B.H. The State responds that the recording fell within hearsay exceptions and was cumulative of other testimony at trial.

---

[6]B.H. stated that she was not "tech-savvy." She mentioned that Appellant would usually help her navigate or operate technology. As a result, B.H.'s review of Appellant's devices was largely guided by Appellant himself.

A. *Standard of Review and Applicable Law*

We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). We will uphold an evidentiary ruling on appeal if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006); *Dering v. State*, 465 S.W.3d 668, 670–71 (Tex. App.—Eastland 2015, no pet.).

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *see Sandoval v. State*, 409 S.W.3d 259, 281 (Tex. App.—Austin 2013, no pet.). Hearsay is inadmissible except as provided by statute or the Rules of Evidence. TEX. R. EVID. 802; *see Sandoval*, 409 S.W.3d at 281. The proponent of hearsay has the burden to establish an applicable exception. *Taylor v. State*, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008)).

B. *Analysis: The Hearsay Objection*

The recording, a four-way conversation between Jane Doe II, Jane Doe, K.L., and B.H, occurred on May 3, 2019, the day of the outcries of Jane Doe and Jane Doe II. When B.H. returned to K.L.'s house after confronting Appellant, she called K.L., Jane Doe, and Jane Doe II out to her car and recorded their subsequent conversation on her cell phone. The State sought to admit the recording over trial counsel's hearsay objection—the State claimed that the statements on the recording were present sense impressions, excited utterances, or then-existing mental,

emotional or physical conditions.[7]  *See* TEX. R. EVID. 803(1)–(3).  The trial court, noting that all the participants on the call were present for direct and cross-examination, overruled the objection.

### 1.  *The Excited Utterance Hearsay Exception Inapplicable*

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  TEX. R. EVID. 803(2); *Salazar*, 38 S.W.3d at 154; *see Sandoval*, 409 S.W.3d at 284.  The reaction to the startling event should be quick enough to avoid the possibility of fabrication.  *Templeton v. State*, 629 S.W.3d 616, 626 (Tex. App.—Eastland 2021, no pet.) (citing *McCarty v. State*, 257 S.W.3d 238, 241 (Tex. Crim. App. 2008)).  The spontaneous nature of the statement is the main factor to be considered when a court determines the admissibility of an excited utterance. *Tienda v. State*, 479 S.W.3d 863, 875 (Tex. App.—Eastland 2015, no pet.) (citing *Tezeno v. State*, 484 S.W.2d 374, 379 (Tex. Crim. App. 1972)).  The declarant must have made the statement before the excitement that is caused by the startling event or condition has abated.  *Sandoval*, 409 S.W.3d at 284.  This is so because the excited utterance exception is based on an assumption that the person making the statement is not then capable of the kind of reflection that would enable her to fabricate the information about which she testifies.  *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005).

In *McCarty,* the court laid out three conditions for a trial court to consider when it determines the admissibility of a hearsay statement under the excited utterance exception:

---

[7]The State did not argue that B.H. was the outcry witness, nor did it allege that the statements in the audio recording met the hearsay exception in Article 38.072 of the Texas Code of Criminal Procedure. *See* CRIM. PROC. art. 38.072, § 2(b) (West Supp. 2023).

(1) the "exciting event" should be startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event should be quick enough to avoid the possibility of fabrication; and (3) the resulting statement should be sufficiently "related to" the startling event, to ensure the reliability and trustworthiness of that statement.

*McCarty*, 257 S.W.3d at 241.

Here, Jane Doe and Jane Doe II recalled abuse that had occurred anywhere from months to years ago,[8] and their statements were not spontaneous enough to avoid the possibility of fabrication as required by *McCarty*. *See Tienda*, 479 S.W.3d at 877–78. Jane Doe testified that her abuse continued until her outcry; Jane Doe II did not say if or when Appellant's sexual abuse stopped but recalled in the recording that Appellant had abused her during the "beginning . . . towards the middle" of 2018. Even if we assume that Appellant had sexually abused both of the victims within the last few days before the statements on the recording were made, the victims spent at least thirty minutes talking with B.H. and K.L. during their outcries, and more time passed as B.H. confronted Appellant, returned to K.L.'s home, and began questioning the victims in her car. Moreover, Jane Doe and Jane Doe II answered most of B.H.'s questions directly and calmly, and some of their responses were preceded by pauses in the conversation.

This and other courts have contemplated the excited utterance exception in similar circumstances and found the exception to be inapplicable to the declarant's statements. *See Tienda*, 479 S.W.3d at 878 (declarant gave statements in response to law enforcement questioning regarding sexual abuse that occurred days or months before the interview, statement was given away from scene, and many answers were

---

[8]On appeal, Appellant focuses on the inadmissibility of the statements made by Jane Doe and Jane Doe II on the recording, rather than the statements made by B.H. and K.L. Therefore, we will confine our analysis to the statements made by Jane Doe and Jane Doe II.

preceded by relatively long pauses); *Barnes v. State*, 165 S.W.3d 75, 81 (Tex. App.—Austin 2005, no pet.) (Eleven–year–old victim's report of sexual abuse to police officer did not constitute an excited utterance because, although testimony established that the victim was crying and "very upset" during the description of sexual abuse, there was "no evidence that . . . [her] emotional state was due to the stress of excitement caused by some startling event or condition."); *Harvey v. State*, 123 S.W.3d 623, 631 (Tex. App.—Texarkana 2003, pet. ref'd) (boyfriend's questioning of victim about her assault six years ago about the paternity of victim's child was not a startling event).

### 2. *The Present Sense Impression Hearsay Exception Inapplicable*

A statement is a present sense impression and falls under the exception to the rule against hearsay if it "describ[es] or explain[s] an event or condition, made while or immediately after the declarant perceived it." TEX. R. EVID. 803(1). "The rationale for [this] exception stems from the statement's contemporaneity, not its spontaneity." *Rabbani v. State*, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992). If the declarant had time to reflect upon the event or the conditions he observed, the event or conditions are not contemporaneous for purposes of this exception. *Fischer v. State*, 252 S.W.3d 375, 381 (Tex. Crim. App. 2008).

The Court of Criminal Appeals has explained that the statement must have been made "before any thoughts of litigation have crystallized" and "without any reflection, thought process, or motive to fabricate or exaggerate." *Id.* at 379. Here, Jane Doe and Jane Doe II's statements were not made "while or immediately after" they perceived the events described on the recording. Therefore, the statements did not constitute present sense impressions as contemplated by Rule 803(1).

### 3. *The Then-Existing Mental, Emotional, or Physical Condition Hearsay Exception Inapplicable.*

A hearsay statement may be admitted if it is a statement of the declarant's "then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." TEX. R. EVID. 803(3). "Texas courts have held that the type of statement contemplated by [Rule 803(3)] includes a statement that on its face expresses or exemplifies the declarant's state of mind—such as fear, hate, love, and pain." *Garcia v. State*, 246 S.W.3d 121, 132 (Tex. App.—San Antonio 2007, pet. ref'd). But "a statement of memory or belief to prove the fact remembered or believed" is subject to exclusion as hearsay. TEX. R. EVID. 803(3); *see Delapaz v. State*, 228 S.W.3d 183, 207 (Tex. App.—Dallas 2007, pet. ref'd). Accordingly, statements of memory to prove a fact remembered do not constitute an exception to the hearsay rule under Rule 803(3). *See* TEX. R. EVID. 803(3); *Glover v. State*, 102 S.W.3d 754, 762–63 (Tex. App.—Texarkana 2002, pet. ref'd) (mother's testimony as to her underage daughter's out-of-court statements about sex with defendant not admissible under Rule 803(3) as purpose of evidence was to prove facts remembered).

Jane Doe's and Jane Doe II's statements regarding Appellant's sexual abuse focused on past facts or conditions and did not relate to their then-existing mental, emotional, or physical conditions. Instead, such statements were of memories and beliefs to prove the facts remembered or believed and do not fit within the hearsay exception in Rule 803(3).

We conclude that the trial court abused its discretion when it admitted an unredacted recording of Jane Doe and Jane Doe II's statements because the statements were permeated with inadmissible hearsay. Our inquiry, however, does

not end there. We must next determine whether Appellant was harmed by the trial court's ruling.

C. *Harm Analysis: No Substantial or Injurious Effect or Influence*

The admission of hearsay over a proper objection is nonconstitutional error. *Ruiz v. State*, 631 S.W.3d 841, 861 (Tex. App.—Eastland 2021, pet. ref'd); *Broderick v. State*, 35 S.W.3d 67, 74 (Tex. App.—Texarkana 2000, pet. ref'd). As such, we must disregard the error unless it affected Appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). One's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). When we assess the likelihood that the error adversely influenced the jury, we consider the entire record, including (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating the defendant's guilt, and (4) whether the State emphasized the complained-of error. *Gonzalez*, 544 S.W.3d at 373; *Motilla*, 78 S.W.3d at 355–56; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Llamas v. State*, 12 S.W.3d 469, 471 (Tex. Crim. App. 2000).

The State argues that the recording was cumulative of the victims' testimony at trial, and therefore its admission was harmless. *See Tienda*, 479 S.W.3d at 881; *Lozano v. State*, 359 S.W.3d 790, 823–24 (Tex. App.—Fort Worth 2012, pet. ref'd). Texas courts have repeatedly held that testimony about and recordings of a child's

11

statements concerning a sexual offense, though hearsay, are harmless when, as here, other unobjected-to evidence was admitted during the trial and proves the same facts. *See Land v. State*, 291 S.W.3d 23, 28–31 (Tex. App.—Texarkana 2009, pet. ref'd) (admission of a recording of a child's interview given was erroneous but harmless when cumulative of the victim's properly admitted live testimony); *Jensen v. State*, 66 S.W.3d 528, 535 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (op. on reh'g) (where child's "live testimony did not differ substantially from the facts revealed in the videotape," admission of videotape was harmless); *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd) (videotape was cumulative of a child's properly admitted testimony on the same issue and therefore not harmful error); *see also Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994).

We first consider the character of the alleged error and how it might be considered in connection with other evidence. *Gonzalez*, 544 S.W.3d at 373. We note that the victims, in the recording, each shared *additional* events that they did not testify about at trial. For example, Jane Doe stated in the recording that Appellant tried to make her touch his penis. Jane Doe II stated that Appellant told her that nobody would believe her. Both of the victims stated that Appellant told them he would "make their lives a living hell" if they told anybody. K.L. told B.H. that Appellant had come into her bedroom once while naked, touching himself, and that Appellant had told K.L. on several occasions that he would make sure her kids were taken away from her if she mentioned any of the abuse against her. However, Jane Doe's, Jane Doe II's, and K.L.'s testimony otherwise largely resembled their in-court testimony, and while their descriptions given in the recording of the events provided more detail than their trial testimony, the recording provided essentially the same facts. The additional statements referenced above were only a small part

12

of the recording. The recording was a seventeen-minute conversation between declarants who were all in attendance and subject to cross-examination at trial. Accordingly, we believe this factor weighs only slightly in favor of a finding of harm.

Second, we consider the nature of the evidence supporting the verdict. Statements of sexually related bad acts and misconduct involving children are inherently inflammatory. *Id.*; *Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013). However, the inadmissible statements were no more serious than similar evidence of assaults that were properly admitted at trial. *See Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd) (noting in a Rule 403 balancing test that the inflammatory nature of a child's sexual abuse was diminished by comparable testimony). We cannot say that the victims' statements misled or inflamed the jury's passions beyond that existing from the properly admitted evidence. The recorded statements contained similar details and accusations to their trial testimony. Based on the facts of this case, the recorded statements of the victims' sexual assaults were neither misleading nor inflammatory. Therefore, this factor weighs against a finding of harm.

Third, we consider the existence and degree of additional evidence indicating the defendant's guilt. *Gonzalez*, 544 S.W.3d at 373. The evidence of Appellant's guilt was strong. We initially note that Appellant does not contend that the evidence was insufficient to find him guilty of any of the charged offenses. At trial, the victims testified extensively about Appellant's abuse over the years, his escalating behavior, and his attempts to hide the abuse. The jury rejected Appellant's defensive theory that the victims were not credible. Strong circumstantial evidence pointed to his guilt as well. The network of cameras that Appellant was responsible for maintaining, the secret cameras placed directly in the victims' rooms, Appellant's

insistence (after their discovery) that the phones only recorded audio—despite the camera holes drilled into the hiding spots and the "glitch[ed]" picture B.H. saw on Appellant's phone—all indicated that Appellant hid inappropriate behavior from the rest of his family. Accordingly, without the admission of the recording, the testimony and other admitted evidence culminated in a strong case of Appellant's guilt. This factor weighs against a finding of harm.

Finally, we consider whether the State emphasized the complained-of error. *Id.* Beyond introducing the recording in the first place, the State did not emphasize its content. It did not repeat the noncumulative events discussed or revisit the recording after its introduction. This factor also weighs against a finding of harm.

Therefore, we find it unlikely that, without the recording, the jury would have been inclined to reject Jane Doe's and Jane Doe II's testimony of sexual abuse but then change its mind once it heard the recording. *See Lumsden v. State*, 564 S.W.3d 858, 891–92 (Tex. App.—Fort Worth 2018, pet. ref'd) (citing *Woods v. State*, No. 02-17-00367-CR, 2018 WL 5289461, at *10-11 (Tex. App.—Fort Worth Oct. 25, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that erroneous admission of forensic interview where in child described abuse with more detail was harmless); *Todd v. State*, No. 02-12-00114-CR, 2013 WL 1457735, at *5 (Tex. App.—Fort Worth Apr. 11, 2013, pet. ref'd) (mem. op., not designated for publication) (same)). Moreover, all of the persons in the recording were witnesses at trial, and Appellant had the opportunity to cross-examine them regarding the circumstances surrounding the recording and its content.

After reviewing the entire record as a whole, we have fair assurance that the erroneous admission of the recording did not influence the jury or had but a slight effect. *See Motilla*, 78 S.W.3d at 355. We conclude that the trial court's error in admitting the recording did not have a substantial or injurious effect or influence the

jury's verdict; therefore, the error did not affect Appellant's substantial rights and such error must be disregarded. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)); *Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd); *see also* TEX. R. APP. P. 44.2(b).

We overrule Appellant's first issue.

*Expert Testimony*

In Appellant's second issue, he argues that the trial court abused its discretion in permitting a witness, Chief David Hullum of the Eastland Police Department, to testify regarding the "statistical frequency of under reporting [sic] of sexual assault." For this issue, Appellant argues that the trial court "failed to properly assess the reliability of [Chief] Hullum's testimony" and therefore erred "in allowing the opinions [Chief] Hullum expressed, solely on the basis [of] his experience and training . . . in the investigation of sexual assault cases." With regard to the preservation of this issue, Appellant argues that his trial counsel's stated objection— "speculation"—addressed the *reliability* of Chief Hullum's testimony, "even if not expressly stated." We conclude that Appellant failed to preserve error on this issue for appeal.

A. *Admission of Expert Testimony*

Lay witness opinion testimony is governed by Rule 701 of the Texas Rules of Evidence, while expert witness opinion testimony is governed by Rules 702 through 705. TEX. R. EVID. 701, 702–05. "Rule 701 covers the more traditional witness— one who 'witnessed' or participated in the events about which he or she is testifying—while Rule 702 allows for a witness who was brought in as an expert to testify." *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002); *see* TEX. R. EVID. 701, 702. "When a witness who is capable of being qualified as an expert

testifies regarding events which he or she personally perceived, the evidence may be admissible as both Rule 701 opinion testimony and Rule 702 expert testimony." *Osbourn*, 92 S.W.3d at 536. "A witness may qualify to give testimony both under Rule 702—because of his or her superior experiential capacity—and under Rule 701, if the witness's testimony and opinion are based upon firsthand knowledge." *Id.*; *see* TEX. R. EVID. 701, 702. Expert testimony is permitted by those who are qualified by training and experience, and their opinions may be based on facts or data that the expert has been made aware of, reviewed, or personally observed. TEX. R. EVID. 702, 703. "Experts are given 'wide latitude' in selecting their foundational sources." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020). A party can challenge the expert's qualifications, the relevance of the opinion, and the reliability of the opinion,[9] and an expert opinion is unreliable if it is only "subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).

The trial court functions as a gatekeeper to determine the reliability, relevance, and admissibility of evidence. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006). Because the Rule 702 inquiry is case-specific and fact-intensive, the reliability determination of expert testimony is flexible, and it is the trial court as gatekeeper that must determine how to assess the reliability of particular testimony. *Wells*, 611 S.W.3d at 426 (citing *Vela*, 209 S.W.3d at 134). The standard of review of a trial court's ruling regarding the admission or exclusion of evidence, including expert testimony, is an abuse of discretion and we must uphold it's ruling if it was within the zone of reasonable disagreement. *Id.* at 427 (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)).

---

[9]Appellant did not argue at trial that Chief Hullum lacked expert qualifications or that his opinion was irrelevant.

B. *Chief Hullum's Testimony*

Chief Hullum described his specialized knowledge, training and experience. At the time of trial, Chief Hullum was the Chief of Police for the city of Eastland. He had served in that capacity for six and one-half years. He testified that he worked in the following law enforcement positions (in reverse chronological order): criminal investigator with the 91st Criminal Judicial District Attorney over the drug task force; Texas Ranger assigned to Eastland, Stephens, Callahan, and Shackleford counties; investigator in the special crimes unit for the Texas Department of Public Safety (DPS) (ten years); trooper for the DPS (four and one-half years); patrol captain at the Gregg County Sheriff's Office (two years); border patrol (two years); narcotics officer at the Gregg County Sheriff's Department (two years). His employment history began in 1978. While serving as an investigator for DPS and as a Texas Ranger he developed "expertise regarding sexual abuse of children cases." He testified that, conservatively, he has investigated over 200 cases that involve the sexual abuse of children. While stationed in Bryan, Texas as an investigator with the DPS, he received training in various forms of investigation including child abuse, sexual assault, and sex crimes in general. These cases were a large part of his caseload in the nine counties that he "was responsible for." Because of his experience, when he became a Texas Ranger, he was frequently called and consulted about cases that involved child abuse and sexual assault.

Chief Hullum, without objection, testified about his specialized training and experience regarding common traits among child sex offenders. He testified regarding his instruction on offender mindsets and opportunity. Chief Hullum testified that he had investigated or participated in the investigation of many cases involving sexual abuse of adults and children.

On direct examination, Chief Hullum was asked five questions regarding persons that underreport sex crimes:

[THE STATE]: When you're dealing with people who have been victimized by sex crimes, is it common or uncommon for the majority of those victims to report those crimes? Well, let me ask this: Is there -- have you -- have you come up with a [sic] knowledge through your training and experience as to the percentage of women who report when they have been victimized?

[DEFENSE COUNSEL]: I'm going to object, that's speculation. That would require beyond a specialized -- we'd have to have some sort of survey. I mean, that's a question I don't think that could be answered in a way that would be meaningful to a jury, most certainly. And that's -- putting a percentage on it, that's kind of taking away --

THE COURT: Please rephrase your question.

[THE STATE]: Based upon your training and experience and the cases that you've dealt with, and that what you have studied yourself, do you have an idea as to how many people -- women report percentage of crimes?

[DEFENSE COUNSEL]: I'm still objecting as to speculation on a percentage without that specialized -- they're asking for, like, a percentage.

THE COURT: Overruled.

[CHIEF HULLUM]: Thirty-five percent is what is claimed for the nonreports. I believe, based on training and experience, that that number is a lot higher.

[THE STATE]: What about children? Are children's percentages greater or lower?

[CHIEF HULLUM]: They're greater.

[THE STATE]: Okay. So women are 35 percent, children is going to be more than 35 percent?

[CHIEF HULLUM]: Yes, ma'am.

18

[THE STATE]: And do you have an opinion as to whether or not that would be -- the percentage for children would be higher or lower than what is anticipated by you?

[CHIEF HULLUM]: I think it's higher.

In the testimony above, the subject of the first two questions by the State, objected to by Appellant, is *women*. But in the three following questions and their accompanying answers, the subject changes to *children* or to include children, to which no objection was made.

C. *The Requirement to Renew Objection or Risk Waiver*

To preserve error on appeal, a party must make a timely request, objection, or motion "with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1(a)(1)(A). The objection at trial must correspond with the issue on appeal. *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). In this regard, "[a]n objection stating one legal basis may not be used to support a different legal theory on appeal." *Edwards v. State*, 97 S.W.3d 279, 287 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *Dominguez v. State*, 474 S.W.3d 688, 700 (Tex. App.—Eastland 2013, no pet.); *Crider v. State*, No. 11-16-00302-CR, 2018 WL 1547217, at *7 (Tex. App.—Eastland Mar. 30, 2018, no pet.) (mem. op., not designated for publication); *Tobar v. State*, No. 14-15-00011-CR, 2016 WL 2975568, at *5 n.8 (Tex. App.—Houston [14th Dist.] May 19, 2016, no pet.) (mem. op., not designated for publication).

"[A] specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony." *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977); *see* TEX. R. APP. P. 33.1(a)(1)(A). With regard to expert testimony, a specific objection regarding expert testimony must detail the particular deficiency in the expert's qualifications or the reliability of the expert's

opinions. *See Chisum v. State*, 988 S.W.2d 244, 250 (Tex. App.—Texarkana 1998, pet. ref'd) (Counsel objected to the expert's opinions but did not specify any particular deficiency in her qualifications or her reliability; no specific complaint about relevancy or reliability of scientific evidence was preserved for appellate review.).

Importantly, "with two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered. The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury." *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (citations omitted). The two exceptions are inapplicable here because neither a running objection nor a hearing outside the presence of the jury was requested by Appellant.

Appellant failed to preserve any issue for appeal regarding the testimony at issue given by Chief Hullum. Appellant objected to the State's question regarding the percentage of *women* who report sexual crimes committed against them. Aside from his speculation objection, Appellant's complaints to the trial court did not detail the particular deficiency of which he complains on appeal. The phrase "we'd have to have some sort of survey" and "[t]hat would require beyond a specialized" (without completing the sentence) at most might challenge the existence of an underlying report or survey or Chief Hullum's specialized knowledge as to the subject of the first and second questions: the percentage of *women* who *report* crimes against them.

Unlike these initial questions however, the State's next three inquiries differ in subject and substance. They inquire as to "*nonreports*[,]" and ask about Chief Hullum's belief about the percentage of *children* who do *not* report the sexual crimes committed against them. Appellant did not object to Chief Hullum's response or to

the State's three questions addressing whether the percentage of "nonreports" for sexual crimes against *children* are higher or lower than the percentage for *women*. Further, as stated, no running objection was requested or granted, nor did Appellant request a hearing outside the presence of the jury in accordance with *Martinez*. *See* 98 S.W.3d at 193. Accordingly, no objections were ever made as to Chief Hullum's testimony regarding the percentage of children not reporting the sexual crimes committed against them. But even if we impute Appellant's unrenewed objection regarding *women* to the State's questions regarding female *children*, no claim of error by the trial court has been preserved. Appellant's failure to renew his objection when the State asked Chief Hullum to compare the percentages of *women and children* waives error, if any, in the trial court's decision to overrule Appellant's objections to the former questions as to percent of *women* reporting or failing to report the sexual crimes committed against them. *See Addington v. State*, No. 14-18-00178-CR, 2020 WL 634427, at *3 (Tex. App.—Houston [14th Dist.] Feb. 11, 2020, no pet.) (plurality mem. op., not designated for publication) (even if, arguendo, the trial court improperly overruled the speculation objection, the error would be harmless because the appellant failed to renew the objection on a subsequent question).

D. *The Bases of Chief Hullum's Expert Testimony*

Even assuming that Appellant's objections preserved his complaint on appeal, Chief Hullum did not vouch for the accuracy nor adopt the thirty-five percent range that he recalled and of which Appellant complains; rather, his testimony was that, based on his personal experience, the percentage of "nonreports" of sexual assault is *higher*. No objection was raised to that testimony. Chief Hullum's testimony addressed events, and the underreporting of sexual abuse by women and children that he personally perceived and that were based on his experience and training. As

such, the trial court did not abuse its discretion when it admitted Chief Hullum's testimony under Rules 701 and 702. *See Osbourn*, 92 S.W.3d at 536; *see also* TEX. R. EVID. 701, 702.

Moreover, on appeal, Appellant argues that the foundation of Chief Hullum's opinion was insufficient in that it was "based, as here, on his experience and training and the 'cases he's dealt with.'" Experience, training, and "cases he's dealt with" *are* proper bases for expert testimony. *See* TEX. R. EVID. 702, 703. In this regard, Chief Hullum founded his opinion, not on subjective belief or speculation, but on extensive specialized training and experience, which is fully detailed in the record. He received training in various forms of investigation, both general and specific to sexual crimes. Chief Hullum estimated that he had investigated at least two hundred child sexual abuse cases.[10] While qualification and reliability are separate inquiries, they overlap in the present case. *See Vela*, 209 S.W.3d at 134 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience.")). Chief Hullum's qualifications—that is, his personal training and experience properly served as bases of his opinion.

Appellant does not claim that Chief Hullum was not an expert in the handling, treatment, and investigation of child abuse cases. Chief Hullum did not rely solely on his qualification, but rather, he explained how he arrived at his conclusions. In five pages of his transcribed testimony, he discusses that he had personally observed

---

[10]The qualifications of Chief Hullum (now Judge Hullum) have twice survived scrutiny from the Court of Criminal Appeals. *Morris v. State*, 361 S.W.3d 649, 667–68 (Tex. Crim. App. 2011) (affirming then-Ranger Hullum's expert testimony on grooming); *see Teczar v. State*, No. 11-09-00183-CR, 2011 WL 1743756, at *10 (Tex. App.—Eastland Apr. 15, 2011, pet. ref'd) (mem. op., not designated for publication) (affirming then-Ranger Hullum's qualifications to testify in the field of child sexual abuse, including reasons why a child might delay in reporting sexual abuse).

22

reasons that cause children to delay in reporting abuse, such as a lack of maturity, education, or life experiences, and the fact that children may be reluctant to approach "a complete stranger" about their abuse. *See Barnes v. State*, 165 S.W.3d 75, 83 (Tex. App.—Austin 2005, no pet.) (Witness testified that over a period of twenty years she had examined hundreds of children who were suspected of being physically or sexually abused; that in her experience, it was not unusual for children to delay their outcry; opinion asked and objected to on the psychological or social reasons for a child to delay her outcry, but instead the witness stated what she had observed during the course of her career. "Even if the question is construed as calling for an opinion, the trial court did not abuse its discretion by concluding that [the witness] was qualified by her experience to answer it."). Further Chief Hullum's testimony would assist the jury in understanding why children may delay reporting sexual abuse. *See Vela*, 209 S.W.3d at 130–31 (relying on TEX. R. EVID. 104(a), 401, 402, and 702, and quoting *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006)); *Barnes*, 165 S.W.3d at 83. Thus, even if we were to conclude that Appellant properly preserved his objections, the trial court did not abuse its discretion in overruling them.

Accordingly, we overrule Appellant's second issue.

*Inclusion of "Good Conduct" Language in the Punishment Charges*

In his third issue, Appellant argues that the trial court erred by including a prior version of the parole law instruction in Article 37.07, Section 4(a), which contained "good conduct" time language, in its punishment charges. He contends this error caused Appellant egregious harm because it is impossible to determine whether the jury properly followed the instructions.

A. *Applicable Law*

The Texas Legislature amended Texas Code of Criminal Procedure Article 37.07, Section 4(a)–(c) in 2019.  Act of May 15, 2019, 86th Leg., R.S., ch. 260, § 3, 2019 Tex. Gen Laws 446, 446–48 (codified at CRIM. PROC. art. 37.07, § 4(a)–(c)).  The amendments apply to any defendant sentenced after September 1, 2019.  *See id.* at 448; *Lewis v. State*, No. 09-21-00082-CR, 2021 WL 6129129, at *8 (Tex. App.—Beaumont Dec. 29, 2021, no pet.) (mem. op., not designated for publication).  Appellant was sentenced on June 3, 2022, making the revised language of Article 37.07, Section 4(a) the language that should have been included in the punishment charges with respect to the indecency-with-a-child convictions and the sexual-assault conviction.[11]

Section 4(a) states in relevant part that the trial court shall instruct the jury during the punishment phase as follows:

> The length of time for which a defendant is imprisoned may be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less.  If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole.  Eligibility for parole does not guarantee that parole will be granted.

> It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the

---

[11]We note that Article 37.07, Section 4(a) does not apply to Appellant's conviction for continuous sexual abuse of a young child.  *See* TEX. GOV'T CODE ANN. § 508.145(a)(2) (West Supp. 2023) (providing that an inmate convicted of continuous sexual abuse of a young child "is not eligible for release on parole").  The trial court properly did not include a parole law instruction consistent with Section 4(a) in its punishment charge for the continuous-sexual-abuse-of-a-child conviction.

application of that law will depend on decisions made by parole authorities.

You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

CRIM. PROC. art. 37.07, § 4(a) (West Supp. 2023). There is no reference to "good conduct time" in the current version of Article 37.07, Section 4(a). The Texas Court of Criminal Appeals has indicated that the legislature chooses language for a reason and that not utilizing statutorily mandated language is a violation of the law. *See Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002). When a trial court errs in not using the proper language, and the defendant does not object, we will not reverse unless the record shows egregious harm to the defendant. *Lewis*, 2021 WL 6129129, at *9 (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). Under the *Almanza* egregious harm standard, the record must show the defendant suffered actual—not theoretical—harm from the charge error. *Almanza*, 686 S.W.2d at 174. "Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory." *Lewis*, 2021 WL 6129129, at *9 (quoting *Ngo*, 175 S.W.3d at 750 (internal quotation marks omitted)).

Appellate courts examine four factors to determine whether an appellant was egregiously harmed by an erroneous jury instruction. "When assessing harm based on the particular facts of the case, we consider (A) the entire jury charge; (B) 'the state of the evidence[,] including contested issues and the weight of the probative evidence'; (C) the parties' arguments; and (D) all other relevant information in the record." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015); *see also*

25

*Ritchey v. State*, No. 11-20-00035-CR, 2022 WL 3649433, at *3 (Tex. App.—Eastland Aug. 25, 2022, no pet.) (mem. op., not designated for publication); *Addison v. State*, No. 05-18-01263-CR, 2020 WL 4251068, at *4 (Tex. App.—Dallas, July 24, 2020, no pet.) (mem. op., not designated for publication).

B. *No Egregious Harm*

The State concedes that the trial court erred by providing an incorrect parole law instruction to the jury, and we agree that it was improper. Appellant did not object to the punishment charges at trial; therefore, the charge error is reviewed for egregious harm using the *Almanza* factors. *See Hooper v. State*, 255 S.W.3d 262, 270 (Tex. App.—Waco 2008, pet. ref'd). Only those charge errors that result in egregious harm will be reversed. *Addison*, 2020 WL 4251068, at *4. We do not find egregious harm here for the reasons that follow.[12]

First, we consider whether the charge itself mitigates against the finding of egregious harm. *See id.* There is a rebuttable presumption that a jury will follow any curative instructions given by the trial court. *Lewis*, 2021 WL 6129129, at *9. Here, the punishment charge deviated from the statutory language:

> *Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and*

---

[12]This type of error does not usually result in egregious harm. *See Ritchey*, 2022 WL 3649433, at *6 n.2 (reaching the same result as we do here and citing multiple recent cases from sister courts of appeals addressing the same issue and reaching the same result, including *West v. State*, No. 10-20-00087-CR, 2022 WL 1105645, at *4 (Tex. App.—Waco April 13, 2022, no pet.) (mem. op., not designated for publication); *Jackson v. State*, No. 03-20-00085-CR, 2022 WL 257451, at *8 (Tex. App.—Austin Jan. 28, 2022, pet. ref'd) (mem. op., not designated for publication); *Lewis*, 2021 WL 6129129, at *10; *Holiness v. State*, No. 06-21-00038-CR, 2021 WL 4483519, at *9 (Tex. App.—Texarkana Oct. 1, 2021, pet. ref'd) (mem. op., not designated for publication); *Addison*, 2020 WL 4251068, at *5; and *Guerra v. State*, No. 06-19-00239-CR, 2020 WL 3634390, at *5 (Tex. App.—Texarkana July 6, 2020, pet. ref'd) (mem. op., not designated for publication)).

*attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.*

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, *without consideration of any good conduct time the defendant may earn.* If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law *and good conduct time* might be applied to this defendant if sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law *and good conduct time.* However, you are not to consider the extent to which *good conduct time may be awarded to or forfeited by this particular defendant.* You are not to consider the manner in which the parole law may be applied to this particular defendant.

(Emphasis added). Despite the addition of the good conduct time language, the punishment charges included mitigating instructions that prohibited the jury from considering parole.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant. . . .

However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

The mitigating language that was included in the punishment charges communicated to the jury that the jurors could accurately predict how good conduct time might affect Appellant or how to calculate the impact of future good conduct. Accordingly, the jury was instructed not to consider during their deliberations the extent to which good conduct would determine actual jail time. The jury is presumed to have followed curative instructions unless there is contrary evidence.

Appellant concedes that courts have held that giving the "outdated" parole instruction is harmless if the trial court, as here, also instructs the jury not to consider parole law as it applies to the defendant. This court has carefully addressed these issues recently. *See Alaniz v. State*, 648 S.W.3d 657, 662–64 (Tex. App.—Eastland 2022, no pet.) and *Arevalo v. State*, 675 S.W.3d 833, 858–61 (Tex. App.—Eastland 2023, no pet.) Nevertheless, citing the dissent from *Keady v. State*, Appellant argues that jurors would be better equipped to avoid misapplying parole laws if the jurors are made to understand the reason why they cannot discuss parole. 687 S.W.2d 757, 762 (Tex. Crim. App. 1985) (Clinton, J. dissenting) (urging courts to provide a reason and stating that the "most practical reason" is that no one can predict if or when an inmate will be released on parole). However, the curative instruction here *does* provide the reason for the jurors—it informs the jury that it cannot be accurately predicted how the parole law would be applied to Appellant because the application of that law depends of the decisions of the parole authorities.[13] The first factor weighs against concluding that Appellant was egregiously harmed by the erroneous instruction.

Second, we consider the state of the evidence. *Arrington*, 451 S.W.3d at 841–44. We have already weighed the strength of the evidence supporting the conviction

---

[13]This reason aligns with Justice Clinton's dissent, which emphasizes that "*no one in this State can predict when an inmate will be released on parole.*" *Keady*, 687 S.W.2d at 762 (Clinton, J., dissenting).

in addressing Appellant's first issue, and we rely on it here. Nothing in the record indicates that the jury was unreasonable in their finding of guilt or punishment. The second factor does not weigh in favor of concluding Appellant was egregiously harmed by the erroneous instruction.

Third, we consider the argument of counsel and any emphasis on the possibility of parole—or good conduct time—to the jury. *Arrington*, 451 S.W.3d at 844. In closing arguments during the punishment phase, Appellant's counsel first mentioned parole laws. Referencing Appellant's conviction for continuous sexual abuse of a child, he told the jury that the absence of a parole provision on this conviction meant that he would serve the sentence "day for day." The State agreed that the sentence for continuous sexual abuse would be served "day for day," but otherwise did not mention the parole law. Neither party emphasized parole laws beyond clarifying Appellant's ineligibility for parole on the continuous-sexual-abuse conviction. Thus, the third factor weighs against concluding that Appellant was egregiously harmed by the erroneous instruction.

Fourth, we consider, from the record as a whole, any other relevant information. *Arrington*, 451 S.W.3d at 844–45. During deliberations, the trial court received a note from the jury that said, "Are terms served as 1 cumulative sentence or 4 consecutive terms?" When there is a jury note inquiring about parole or good conduct time, courts are more prone to find egregious harm. *Hooper*, 255 S.W.3d at 272. The jury note, however, did not mention parole or good conduct time; rather, it questioned whether the recommended sentences would be served concurrently or cumulatively. *See Ritchey*, 2022 WL 3649433, at *5. There is nothing in the record indicating that the jury considered the application of good conduct time when it assessed Appellant's sentences. *See Holiness*, 2021 WL 4483519, at *8.

Further, Appellant's fifty-year sentence for the continuous-sexual-abuse conviction weighs against a finding of egregious harm. As both parties made clear in their closing arguments, Appellant's conviction for continuous sexual abuse of a child made him ineligible for parole. After thirty minutes of deliberation, the jury assessed Appellant's punishment on all four convictions. On his conviction for continuous sexual abuse of a child, the jury assessed Appellant's punishment at fifty years—which the jury understood would be served "day for day." No other conviction resulted in a longer term of imprisonment. With their verdict, the jury made it clear they intended Appellant to serve fifty years without the possibility of parole. The fourth factor weighs against concluding that Appellant was egregiously harmed by the erroneous instruction.

Because all four factors weigh against concluding that Appellant was egregiously harmed by the erroneous instruction, we overrule Appellant's third issue.

*This Court's Ruling*

We affirm the judgments of the trial court.


W. BRUCE WILLIAMS

JUSTICE


March 14, 2024

Do not publish. See Tex. R. App. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.